# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

Fern Helms, individually and on behalf of all others similarly situated,

        Plaintiff,

        v.

Facebook, Inc., Mark E. Zuckerberg, David M. Wehner, and Sheryl K. Sandberg,

        Defendants.

Civil Action No. _____

## CLASS ACTION COMPLAINT

## <u>JURY TRIAL DEMANDED</u>

---

## I.     NATURE OF THE ACTION

1.      Plaintiff Fern Helms, individually and on behalf of a class of similarly situated persons and entities, by and through their undersigned attorneys, alleges the following against Facebook, Inc. and the Individual Defendants (defined below), upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

2.      Plaintiff brings this federal securities class action on behalf of itself and a class consisting of all persons and entities who purchased, or otherwise acquired, the publicly traded securities of Facebook, Inc. from October 1, 2017 through July 26, 2018, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

3.      The Defendants in this action are: Facebook, Inc. ("Facebook"); Mark E. Zuckerberg ("Zuckerberg"), Facebook's founder and Chief Executive Officer ("CEO"); David M. Wehner ("Wehner"), Facebook's Chief Financial Officer ("CFO"); and Sheryl K. Sandberg ("Sandberg"), Facebook's Chief Operating Officer ("COO").  Zuckerberg, Wehner, and Sandberg are collectively the "Individual Defendants."  Facebook and the Individual Defendants are collectively the "Defendants."

4.      Facebook operates a social networking platform (the "Platform") that allows people to communicate with their family, friends, and coworkers. Facebook develops technologies that facilitate the sharing of information, photographs, website links, and videos.  By the end of 2017, Facebook had over 2.2 billion active users across the world.

5.      Plaintiff's and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

6.      Plaintiff's allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Facebook and the Individual Defendants; (ii) research reports issued by financial analysts concerning Facebook; (iii) reports and other documents filed publicly by Facebook with the U.S. Securities and Exchange Commission ("SEC"); (iv) Facebook's corporate website; (v) transcripts of hearings before the United States Congress; (vi) press reports; and (vii) other publicly available information.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

7.      Throughout the Class Period, Defendants made materially false and misleading statements regarding Facebook's business and operations.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the implementation of the General Data Protection Regulation ("GDPR"), which was adopted by the European Union on or around April 14, 2016, would have a foreseeable and materially negative impact on use of the Platform, revenue growth, and profitability because the informed consent required by the GDPR resulted in many users rejecting Facebook's privacy policies and/or procedures and exposed a significant number of fake accounts on the platform; (ii) by May 25, 2018, Facebook's Platform use and revenue growth had already begun to decline as a result of Facebook's efforts to comply with the GDPR; (iii) the decline in Facebook's Platform use and the increase in costs as a result of complying with the GDPR had a materially adverse effect on Facebook's financial health, including its revenue and projected growth; and (iv) as a result, Facebook's public statements were

materially false and misleading at all relevant times.

8.      On July 25, 2018, Facebook released its Second Quarter 2018 Results, which details its financial results for the quarter ending in June 30, 2018.  Facebook reported that it had missed many of its key financial metrics, including its projected revenue, earnings per share, and global daily active users ("DAUs") and monthly active users ("MAUs").  Facebook also reported its slowest ever quarterly growth in revenue, DAUs, and MAUs.

9.      Later that day, during Facebook's Second Quarter 2018 Results Conference Call, which discussed Facebook's Second Quarter 2018 Results, Zuckerberg admitted that "GDPR was an important moment for our industry.  We did see a decline in monthly actives in Europe – down by about 1 million people as a result."  Wehner, in an attempt to minimize Zuckerberg's admission, noted that "European ad revenue growth decelerated more quickly than other regions and was impacted primarily by reduced currency tailwinds and, to a lesser extent, the rollout of GDPR."  Wehner also announced that Facebook expected to have "revenue growth rates to decline by high single digit percentages from prior quarters sequentially in Q3 and Q4" and its expenses to grow 50% to 60%.

10.     These revelations had a devastating effect on Facebook's stock price.  The stock dropped about 7% almost immediately after the Quarter 2018 Results were released.  During the conference call involving the Individual Defendants, the stock plummeted to a loss of more than 20%.[1]  By the days end, Facebook's stock price declined from a class

---

[1] Mark A. Cherney, "Facebook stock drops roughly 20%, loses $120 billion in value after warning that revenue growth will take a hit," MarketWatch, Jul. 26, 2018, https://www.marketwatch.com/story/facebook-stock-crushed-after-revenue-user-growth-miss-2018-07-25.

period high of $218.62 per share to $176.26 per share.  This drop caused a loss of approximately $120 billion in market capitalization, causing substantial losses to investors.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Facebook's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

12.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

14.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

### III.    PARTIES

####     A.    Plaintiff

16.     Plaintiff Fern Helms ("Plaintiff") is a U.S. citizen currently residing in California.  Plaintiff, as set forth in the accompanying Certification, purchased 100 common shares of Facebook on or around July 6, 2018 and was damaged by the news that Facebook had missed many of its key financial metrics on or around July 25, 2018.

####     B.    Defendants

17.     Defendant Facebook, Inc. is incorporated in Delaware and has its principal executive offices at 1601 Willow Road, Menlo Park, California 94025.  Facebook's securities trade on the NASDAQ under the ticker symbol "FB."

18.     Defendant Mark E. Zuckerberg is Facebook's founder, has served at all relevant times as its CEO, and is a resident of California.

19.     Defendant David M. Wehner has served at all relevant times as Facebook's CFO and is a resident of California.

20.     Defendant Sheryl K. Sandberg has served at all relevant times as Facebook's COO and is a resident of California.

### IV.    FACTUAL BACKGROUND

####     A.    Facebook

21.     Facebook is the world's largest social networking platform with over 1.4 billion users accessing the Platform per day, with users in at least 60 countries.

22.     Facebook operates a social networking platform that allows people to communicate with their family, friends, and coworkers, and develops technologies that facilitate the sharing of information, photographs, website links, and videos.  Users can

access and utilize the Platform for "free," in the sense that no sign-up fee, access fee, or monthly user fee is collected by Facebook from its users.  However, users are subject to viewing advertisements on Facebook's social network.

23.     Facebook collects data about its users to help advertisers and developers better target potential customers, for which it earns almost the entirety of its billions in revenues. As Zuckerberg described in April 2018 when testifying before Congress, Facebook "run[s] ads" to sustain its business model.  Last year alone, Facebook made 98% of its revenue from advertising, giving it over $39 billion in revenue.

24.     Thus, Facebook's revenue is directly linked to its ability to collect data about its user base.  Advertisers favored purchasing advertising on Facebook's social network because Facebook could collect and leverage a wealth of data about its users to empower advertisers to specifically target of customers based on, amongst many other things, their psychological profile, search history, personal network, or relationship status.

       **B.**       **General Data Protection Regulation**

25.     The GDPR is a regulation that pertains to the processing of individuals' personal data.  It imposes several requirements on all entities (such as Facebook) that process and target personal data from individuals located in the European Union.  The GDPR requires, among other things, that the processor (*e.g.*, Facebook) disclose any data collection, disclose whether the data is being shared with any third parties, and to delete the data under certain circumstances.  The GDPR also requires that entities notify individuals in the European Union whose data may have been breached, compromised, or deleted.  The GDPR also imposes significant reporting and internal control requirements, mandating companies like Facebook to appoint a data collection officer and to report its

compliance to the GDPR's provisions to independent public authorities appointed by European Union member states. The GDPR further requires the processor to obtain a user's affirmative consent before using and distributing that user's personal data, as well as limiting the breadth of consent given.

26.     The GDPR was adopted by the European Council and Parliament on April 14, 2016. All companies operating within the European Union had to comply with the GDPR by May 25, 2018 or face stiff penalties.

27.     In or around August 2017, Facebook began implementing changes to its products, including the Platform, because of the GDPR.[2]  According to a Facebook representative, Facebook had assembled "the largest cross-functional team in the history of the Facebook family of companies," to implement these changes, including teams to conduct legal, product, and engineering assessments on the GDPR's impact.[3]

28.     By February 2018, Facebook knew or should have known of the extraordinary impact the GDPR would have on its products, including the Platform. Roughly 73% of the Platform's European users were targeted by marketers based on personal characteristics, such as sexual orientation or political beliefs—which was illegal under the GDPR.[4]

29.     On April 2018, Facebook announced that it planned to comply with GDPR's

---

[2] Aliya Ram, "Tech sector struggles to prepare for new EU data protection laws," Financial Times, Aug. 29, 2017, https://www.ft.com/content/5365c1fa-8369-11e7-94e2-c5b903247afd.
[3] *Id.*
[4] Aliya Ram and Hannah Kuchler, "Facebook seen struggling with new European privacy rules," Financial Times, Feb. 21, 2018, https://www.ft.com/content/11ed3f18-172b-11e8-9e9c-25c814761640.

data privacy rules around the world, not just for users in the European Union.[5]

### C.       Defendants' Materially False and Misleading Statements

30.      During Facebook's Q3 2017 Earnings Conference Call on November 1, 2017,

Sandberg was asked by an investor what potential impacts the GDPR would have on

Facebook.  Sandberg responded:

> We believe that we'll be able to obtain consent for uses of the data across Europe
> and that people still expect the content and their ads to be relevant. We expect a
> good result here and we're going to do it very carefully and very seriously as we
> always do.

31.      During Facebook's Q1 2018 Earnings Conference Call on April 25, 2018,

Wehner was asked how GDPR would affect Facebook's advertising revenue and whether

there was a "doomsday" scenario.  Wehner responded as such:

> Mark, on the first question, I don't know that we really see a doomsday scenario
> here. I think what we think is that depending on how people react to the controls
> in the ad settings, there could be some limitations to data usage. You know we
> believe that those will be relatively minor but depending on how broadly the
> controls are adopted and set, there is a potential impact targeting for our
> advertisers. Obviously, if they are less able to target effectively, they'll get a lower
> ROI on their on their on their advertising campaigns. They'll then bid differently
> into the auction. That ultimately will flow through into how we can realize price
> on the impressions that we're selling.
>
> So I think that's the mitigating issue that we could see depending on how GDPR
> in our broader commitment to providing the same controls worldwide could play
> out. We think that there is a great case for not just our business but also for the
> user experience on Facebook to have targeting because we think it's a better
> experience for the people who use Facebook to have targeted ads. We think we
> can do that in a privacy-protected way and it's just a better experience. You get
> more relevant ads and I think overall benefits not only the advertisers, but also the
> people who use Facebook. So, I don't think we see a real doomsday scenario here.
> We see an opportunity to really make the case.

32.      During Facebook's Q2 2018 Earnings Conference Call on July 25, 2018, the

---

[5] Josh Constine, "Zuckerberg says Facebook will offer GDPR privacy controls
everywhere," TechCrunch, Apr. 4, 2018, https://techcrunch.com/2018/04/04/zuckerberg-
gdpr/.

Individual Defendants tried to minimize the impact of GDPR on Facebook's revenue.

33.     In the Q2 2018 call, Wehner stated:

> So GDPR didn't have a significant impact in Q2 partially because of its implementation day -- so you're just seeing effectively one month of it. In terms of revenue, we do think that there will be some modest impact, and I don't want to overplay these factors, but you've got a couple things going on. You've got the impact of the opt-outs, and while we're very pleased with the vast majority of people opting into the third party data use, some did not, so that will have a small impact on revenue growth.

34.     On the same call, Sandberg stated:

> Yeah, I can talk about GDPR. GDPR has not had a significant revenue impact but we also recognize it wasn't fully rolled out this quarter. It was very encouraging for us to see that the vast majority of people affirmed that they want us to use information including from the websites they visit to make their ads more relevant. But as we look further out, we recognize that there's still risk and we're gonna watch closely. Advertisers are still adapting to the changes so it's early to know the longer-term impact.
>
> And things like GDPR and other privacy changes that may happen from us or may happen with regulation to make ads more relevant. One thing that we know that's not going to change is that advertisers are always looking for the highest RLI opportunity and what's more important in winning budgets is our relative performance in the industry and we believe will continue to do very well on that.

35.     The statements referenced above were materially false and/or misleading because they misrepresented and/or failed to disclose material adverse facts pertaining to Facebook's business, operational, and financial results, which were known to Defendants at the time.  Specifically, Defendants' statements failed to disclose that Facebook's efforts to comply with GDPR would have a foreseeable and negative impact on the use of the Platform, Facebook's ability to collect data about its user base, and, in turn, Facebook's ability to sell advertising and its revenue.  By May 25, 2018, Facebook's social network use and revenue growth had already begun to decline because of Facebook's efforts to comply with the GDPR.

36.      Expert Wall Street analysts were shocked by Defendants' revelations and to Facebook's precipitous share price drop on July 26, 2018.[6] These reactions further reinforce the fact that Defendants had made materially false and/or misleading misrepresentations and had failed to properly disclose Facebook's revenue outlook to investors.

37.      A J.P. Morgan analyst stated:

> Facebook's second-quarter results and outlook are disappointing, but 'startling' is probably a better word. We think few, if any, anticipated this kind of reset. Facebook is battling its own scale & law of large numbers, w/FXN revenue generally decelerating over the past two years. As noted above, there are some specific challenges related to user behavior & policies.

38.      A Bank of America analyst stated:

> While the outlook was a negative surprise and cautious read on core Facebook engagement growth trends and long-term infrastructure costs that will linger as overhangs, we expect some support for the stock on the view that there is upside potential vs a low bar, and that revenues could reaccelerate after a usage shift (stories, video) adjustment period.

39.      A Jefferies analyst stated:

> The guided deceleration was a surprise to everyone, but given growth in the first half of 2018, the guide seems extremely cautious.

40.      The Individual Defendants' statements above (¶¶ 30–34) were materially false and/or misleading at the time they were made.  However, the truth was not revealed to the investing public until July 25, 2018.  In stark contrast to Facebook's positive statements since November 2017, during the Second Quarter 2018 Conference Call, Zuckerberg admitted that Facebook had lost approximately 1 million monthly active users in Europe

---

[6] Michael Bloom and Thomas Franck, "Here's what every major Wall Street analyst had to say about Facebook's plummeting stock," <u>CNBC</u>, Jul. 26, 2018, https://www.cnbc.com/2018/07/26/heres-what-every-major-wall-street-analyst-had-to-say-about-facebook.html

due to the implementation of GDPR.

41.     The GDPR negatively impacted Facebook's user base in several ways.  First,
because Facebook now had to obtain the informed consent from all its users in the EU,
many users declined to participate on the Platform after being apprised of Facebook's
privacy policies and/or procedures.

42.     Second, this process of obtaining informed consent eliminated a significant
number of fake accounts, including "bots," or automated user accounts that are designed
to mimic real users, from the Platform's inflated DAUs and MAUs numbers by adding
new barriers to user involvement—namely, requiring affirmative action on the user's part
to use their data.[7]

43.     Additionally, Facebook's Second Quarter 2018 Results revealed that it had
missed its targets on many of its key financial metrics, including revenue, earnings per
share, DAUs, MAUs, and average revenue per user.  Defendants knew or were severely
reckless in not knowing that GDPR compliance, and Facebook's adoption of GDPR-
compliant controls globally, would increase Facebook's operating expenses and decrease
its greatest source of revenue—its user base.

**D.      The Effects of Defendants' Disclosure on Facebook's Stock Price**

44.     The Individual Defendants' eventual disclosure of the effects of the GDPR had
a precipitous effect on Facebook's stock price.  The stock dropped about 7% immediately
after the Quarter 2018 Results were released.  During the conference call involving the

---

[7] Renee Di Resta, et. al, "The Bots That Are Changing Politics," Vice, Nov. 2, 2017,
https://motherboard.vice.com/en_us/article/mb37k4/twitter-facebook-google-bots-
misinformation-changing-politics.

Individual Defendants, the stock plummeted to a loss of more than 20%.[8]  By the day's end, Facebook's stock price declined from a class period high of $218.62 per share to $176.26 per share.

45.     Facebook's market capitalization on Wednesday, July 25, 2018 was approximately $630 billion.  But by the end of trading on Thursday, July 26, 2018, its market capitalization was approximately $510 billion, representing a loss of approximately $120 billion.  This was the largest one-day loss in market value by any company in U.S. stock market history.

## V.     CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Facebook publicly traded securities from October 1, 2017 through July 26, 2018, inclusive, and who were damaged thereby. Excluded from the Class are: Defendants; members of the immediate family of any Defendant who is an individual; the officers and directors of Facebook during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; Facebook's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

47.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Facebook common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to

---

[8] Cherney, *supra*, note 1.

Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Facebook or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Facebook;

- Whether the Individual Defendants caused Facebook to issue false and misleading financial statements during the Class Period;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- Whether the prices of Facebook securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.     Plaintiff's claims are typical of the claims of the other members of the Class, as

all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

50.     Plaintiff will adequately protect the interests of the Class and have retained competent counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

51.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.     CAUSES OF ACTION

### COUNT I

**For Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5**

**(Against All Defendants)**

52.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

53.     Plaintiff asserts this Count pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder against Defendant Facebook and the Individual Defendants.

54.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 in that they

    a.   Employed devices, schemes, and artifices to defraud;

    b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Facebook securities during the Class Period.

56.    By virtue of their positions at Facebook, as senior executives and/or directors on the Facebook's Board, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executive managers and/or directors of Facebook, the Individual Defendants had knowledge of the details of Facebook's internal affairs. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did,

directly or indirectly, control the content of the statements of Facebook. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Facebook's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Facebook securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Facebook's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Facebook securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

58.      Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Facebook securities. Plaintiff and the other members of the Class would not have purchased Facebook securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the Securities Exchange Act

### (Against the Individual Defendants)

59.      Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

60.     Plaintiff asserts this Count pursuant to Section 20(a) of the Securities Exchange Act against the Individual Defendants.

61.     During the Class Period, the Individual Defendants participated in the operation and management of Facebook, and conducted and participated, directly and indirectly, in the conduct of Facebook's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Facebook's businesses, operations, future financial condition, and future prospects.

62.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Facebook's financial condition and results of operations, and to correct promptly any public statements issued by Facebook which had become materially false or misleading.

63.     Because of their positions of control and authority as senior executive officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Facebook disseminated in the marketplace during the Class Period. Each of the Individual Defendants exercised control over the general operations of Facebook, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and other members of the Class complain. The Individual Defendants therefore, were "controlling persons" of Facebook within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Facebook securities.

64.     Facebook violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff

and the other members of the Class suffered damages in connection with their purchases of Facebook's securities during the Class Period.

65.     By reason of their control of Facebook, the Individual Defendants are liable pursuant to Section 20(a) of the Securities Exchange Act for Facebook's violations of Section 10(b) and Rule 10b-5, to the same extent as Facebook.

## VII.   PRAYER FOR RELIEF

Plaintiff prays for judgment as follows:

A.     Declaring that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: July 27, 2018

David L. Hecht
Yi Wen Wu
**PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**
20 West 23rd Street. Fifth Floor
New York, NY 10010
tel: (213) 262-9333

Attorneys for Plaintiff

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I, Fern Helms, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed the Complaint against Facebook, Inc. ("Facebook" or the "Company"), and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.    I did not purchase or acquire Facebook securities at the direction of counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Facebook securities during the Class Period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the transactions set forth below in Exhibit A, attached hereto, represent all of my transactions in Facebook securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve or served as a representative party on behalf of a Class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class as ordered or approved by the Court.

8.    I declare, under penalty of perjury, that the foregoing is true and correct.

Executed: _____7-27-18_____ (Date)

_____

Fern Helms

EXHIBIT A

